**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>C.T.W. REALTY CORP.,<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No. 19-11425 (MKV)<br><br>Hearing Date: TBD |

**DECLARATION OF DAVID BORNHEIMER**

DAVID BORNHEIMER, of full age, declares as follows:

1.　　I am a Vice President of Midland Loan Services, a division of PNC Bank, National Association ("Midland"), which is the special servicer to Holder Wilmington Trust, N.A., as Trustee for the Benefit of the Holders of LCCM 2017-LC26 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-LC26 ("Holder"). Holder is the lawful owner and holder of the mortgage for the real property located at 55-59 Chrystie Street, New York, New York (the "Mortgaged Property"). The Property is owned by the debtor C.T.W. Realty Corp. ("CTW", the "Borrower" or the "Debtor"). I am fully familiar with the facts and circumstances set forth herein and submit this declaration in support of Holder's motion to excuse compliance by the receiver (the "Receiver") appointed pre-petition by the court presiding over the action by Holder to foreclose its mortgage on the Mortgaged Property. As set forth below, it is my belief that excusing the Receiver from having to turn back possession of the Mortgaged Property to the Debtor will create an unmitigated disaster.

2.　　Though what follows is lengthy, at the outset I do wish for the Court to know that Holder obtained a foreclosure judgment (the "Foreclosure Judgment") prior to the Debtor filing this bankruptcy case and the Debtor's filing was the evening before the scheduled foreclosure sale.

144282705.1

3. I am fully familiar with the facts of this case and the events to date based upon my personal knowledge and review of Holder's business records relating to this loan that are relevant to this affidavit.

4. Midland is a business. I am personally familiar with the asset management practices and procedures of Midland with regard to servicing of mortgage loans, including record keeping as it pertains to custody of notes, mortgages and other loan documents with respect to mortgage loans held by trustees and entities for whom Midland serves as special servicer, including for Holder. Midland services mortgage loan accounts in the regular course of its business and makes, in the regular course of its business, records of the acts, transactions, custody of loan documents, events and occurrences regarding and pertaining to the mortgage loans it services. In addition, Midland in servicing mortgage loan accounts in the regular course of its business utilizes records prepared by other agents of the holder of the Loan Documents, such as the trustee for any securitized loan (of which the Loan is one), the master servicer for the loan or prior owners or special servicers (the "Agents"). Records of such acts, transactions, custody of documents, events and occurrences are made in the regular course of the business of Midland and the other Agents, and it is the regular course of business of Midland and the Agents to make these records at the time of the acts, transactions, events and occurrences or within a reasonably prompt time thereafter.

5. In connection with preparing this affidavit, I personally reviewed the collateral file that is maintained by the Trustee for this Loan (the "**Collateral File**"). The collateral file for this Loan holds originals (or in the case of certain originals submitted to government recording offices, stamped copies) of the Loan Documents and of the instruments described herein as assigning one or more of the Loan Documents (defined below).

## THE LOAN AND LOAN DOCUMENTS

6. On or about February 10, 2017, Ladder Capital Finance LLC ("Original Lender") Original Lender agreed to make a loan or loans (the "Loan") to Borrower, in accordance with the terms and conditions of that certain loan agreement (the "Loan Agreement") dated February 10, 2017. A true and correct copy of the Loan Agreement is attached hereto as Exhibit A.

7. The Loan is in part evidenced by that certain Amended, Restated and Consolidated Promissory Note dated February 10, 2017 (the "Note") in the original principal amount of Twenty-Five Million One Hundred Twenty-Five Thousand and 00/100 Dollars ($25,125,000.00) executed by Borrower in favor of Original Lender. A true and correct copy of the Note together with all allonges described in this affidavit is annexed hereto as Exhibit "B".

8. As security for the payment of the Loan, on or about February 10, 2017, Borrower executed and delivered to Original Lender that certain Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents and Security Agreement dated February 10, 2017 (the "Mortgage") securing the obligations under the Note.

9. The Mortgage was recorded in the New York Office of the City Register on February 22, 2017 as Document ID 2017022100591002, CRFN 2017000072559.

10. The Mortgage encumbers that certain real property described therein (all property given as security thereunder, the "Property").

11. A true and correct copy of the Mortgage as recorded evidencing a first priority lien is annexed hereto as Exhibit "C".

12. In addition to being a real property mortgage, the Mortgage is a "security agreement" within the meaning of the Uniform Commercial Code. Section 15 of the Mortgage provides that the Mortgage is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Property which, under

applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and under that section Borrower granted to Original Lender a security interest in said items.

13. As additional security for the payment of the Loan, on or about February 10, 2017, Mortgagor executed and delivered to Original Lender, an Assignment of Leases and Rents securing the obligations under the Note (the "Assignment of Rents"). A true and correct copy of the Assignment of Rents is annexed hereto as Exhibit "D".

14. The Assignment of Rents was duly recorded in the New York Office of the City Register on February 22, 2017 as Document ID 2017022100591003, CRFN 2017000072560.

15. As further security for the payment of the Loan, on or about February 10, 2017, Guarantor executed and delivered to Original Lender, a Guaranty of Recourse Obligations guaranteeing the payment of certain obligations under the Loan Documents (the "Guaranty"). A true copy of the Guaranty is annexed hereto as Exhibit "E" and its terms are expressly incorporated herein by reference and made part hereof as though fully and completely set forth herein.

16. Pursuant to the Guaranty, Guarantor absolutely and unconditionally guaranteed to Holder the prompt and unconditional payment of the Guaranteed Recourse Obligations of Borrower (as defined in the Guaranty), which include, among other things, liabilities, costs, losses, damages, expenses or claims suffered or incurred by Holder by reason of or in connection with any of the events or circumstances described in Section 12 of the Note. In addition, the Guarantor under the Guaranty is liable for all legal fees and other costs and expenses incurred by the lender under the Note in enforcing any of the Guaranteed Recourse Obligations of Borrower.

17. Borrower also executed and delivered to Original Lender that certain Cash Management Agreement dated February 10, 2017. The Cash Management Agreement provides for, inter alia, security interests in and control over cash proceeds of the Borrower's operations on

the terms and conditions set forth therein. A true and correct copy of the Cash Management Agreement is annexed hereto as Exhibit "F".

18. Effective as of March 13, 2017, the Loan, the Note, the Mortgage and the Assignment of Rents were assigned to Ladder Capital Finance II, LLC through execution and delivery of the Original Lender Assignments (defined in this paragraph below). An allonge to the Note was executed and delivered from Original Lender to Ladder Capital Finance II, LLC. A true and correct copy of that allonge to the Note by which the Note was transferred are attached to the Note as Exhibit B as described above. True and correct copies of the Assignment of Mortgage by Original Lender (the "Original Lender Assignment of Mortgage") dated as of March 13, 2017 and recorded June 13, 2017 in the Office of the New York City Register, as CRFN 2017000218648, and the substantially contemporaneous Assignment of Assignment of Leases and Rents executed and delivered to Ladder Capital Finance II, LLC and recorded dated as of March 13, 2017 and recorded June 13, 2017 in the Office of the New York City Register, as CRFN 2017000218649 (the "Original Lender Assignment of Assignment of Leases"; together with the Original Lender Assignment of Mortgage, the "Original Lender Assignments") are annexed hereto as Exhibit "G."

19. The Original Lender Assignment of Mortgage was duly recorded in the real estate records of Office of the Clerk for New York County, New York as set forth above and the recording fee was duly paid.

20. Effective as of June 29, 2017, the Loan, the Note, the Mortgage and the Assignment of Rents were assigned to Holder, through execution and delivery of the Ladder Capital Assignments (defined in this paragraph below). An allonge to the Note was executed and delivered from Ladder Capital Finance II, LLC to Holder. A true and correct copy of that allonge to the Note by which the Note was transferred are attached to the Note as Exhibit B as described above. Copies of the Assignment of Mortgage by Ladder Capital Finance II LLC and Series TRS of

Ladder Capital Finance II LLC, a series of Ladder Capital Finance II LLC (the "Ladder Capital Assignment of Mortgage") dated as of June 29, 2017 and recorded in the Office of the New York City Register on December 11, 2017 as Document ID 2017121100873001, CRFN 2017000453077, and the substantially contemporaneous Assignment of Assignment of Leases and Rents executed and delivered to Holder and recorded December 11, 2017 in the Office of the New York City Register, as CRFN 2017000453078 (collectively, the "Ladder Capital Assignments"; together with the Original Lender Assignments, the "Assignments") are annexed hereto as Exhibit "H."

21. The Ladder Capital Assignment of Mortgage was duly recorded in the real estate records of Office of the Clerk for New York County, New York as set forth above and the recording fee was duly paid.

22. On February 13, 2017, a UCC-1 Financing Statement was filed with the New York Department of State at file number 201702130069329 (the "Original State UCC"), and on June 16, 2017, a UCC-3 Assignment of Financing Statement at file number 201706160295562 was filed with the New York Department of State, whereby the Original State UCC was assigned to Lender. A true and correct copy of the UCC-3 assignment reflecting the filing number of the Original State UCC is attached hereto as Exhibit "I."

23. On February 22, 2017, 2017, a UCC-1 Financing Statement was filed in the New York Office of the City Register at file number CRFN 2017000072567 (the "Original County UCC"), and on June 12, 2017, a UCC-3 Assignment of Financing Statement was filed in the New York Office of the City Register at file number CRFN 2017000218650, and on November 13, 2017, a UCC-3 Assignment of Financing Statement was filed in the New York Office of the City Register at file number CRFN 2017000409043, whereby the Original County UCC was assigned

to Lender. True and correct copies of the Original County UCC and assignments thereof are attached hereto as Exhibit "J."

24. As of the date of the filing of the Verified Complaint to commence this action and as of the date of this affidavit, Holder was and is the owner and holder of and has had and has physical custody and control of the original Note with allonges above, the original Mortgage, the Guaranty, and each of the original Loan Documents.

25. Moreover, as a result of the transactions described above, as evidenced by each of the written assignments, of the date of the filing of the Verified Complaint Holder was and as of the date of this affidavit is the owner of the Note, Mortgage, and the Guaranty.

26. The Loan, the Loan Agreement, the Note, Mortgage, the Assignment of Rents, the Cash Management Agreement and the Ladder Capital Assignments and all other instruments or documents evidencing or securing the obligations of Borrower under the Note and/or any other loan document are collectively referred to herein as the "Loan Documents."

## DEFAULTS UNDER THE LOAN DOCUMENTS

27. Borrower failed to pay the monthly installment of interest due on March 6, 2018, an Event of Default. Holder provided written notice of Borrower's default to Borrower and Guarantor by letter dated May 17, 2018 (the "Default Letter"). A true and correct copy of the Default Letter is annexed hereto as Exhibit "K."

28. Further, Borrower failed to provide required documentation in connection with the opening of accounts under the Cash Management Agreement. Section 6.1 of the Loan Agreement provides that, upon a Cash Management Trigger Event (which includes an Event of Default, which has occurred), Borrower is required to establish a Clearing Account (as defined in the Loan Agreement), bring about execution and delivery of the Clearing Account (as defined in the Loan

Agreement) and, for the remainder of the Term of the Loan, cause all tenants' rents to be transmitted directly to the Clearing Account.

29. Borrower never established any Clearing Account, executed any Clearing Account Agreement to which Holder is a party or, to Holder's knowledge, caused any tenant's rents to be transmitted directly to the Clearing Account.

30. Attached hereto as Exhibit "L" is a true and correct copy of a mortgage dated December 11, 2017 ("Subordinate Mortgage") made by Borrower and 381 Broadway Realty Corp. to Titan Capital ID, LLC (the "Subordinate Mortgagee") in the original principal amount of $3,500,000.00, which was duly recorded in the real estate records of Office of the City Register of the City of New York, New York on December 28, 2017 at City Register File No.: 2017000473266. The lien of the Subordinate Mortgage is subject and subordinate to the lien of the Holder's mortgage. Subordinate Mortgagee did not contest Holder's mortgage priority in the foreclosure action (the "Foreclosure Action") in the Supreme Court of New York, New York County (the "State Court") that gave rise to the Foreclosure Judgment.

31. An Event of Default under the Loan Documents occurred on the date of the recording of the Subordinate Mortgage, namely, December 11, 2017. Accordingly, the Loan is and has been bearing interest at the Default Interest Rate since that date, December 11, 2017.

32. Borrower's granting of the Subordinate Mortgage to Subordinate Mortgagee is an Event of Default under the Loan Agreement, Article 10, Section 10.1(a)(xiii) and thereby is an Event of Default under the Mortgage under Section 3.7 of the Mortgage.

33. In addition, through August 2018, Borrower and Guarantor (defined below) had failed to deliver timely all reports and other financial information required to be delivered under Section 4.1.7 of the Loan Agreement.

34. In particular, Borrower did not deliver any financial statement for the Fiscal Year ending December 31, 2017 until August 6, 2018, over a week and a half after the initial hearing on Holder's application for a receiver. A true and correct copy of that financial statement (the "2017 Statement") that Borrower delivered is attached hereto as Exhibit "M". Two days later, Borrower delivered an updated financial statement combining for the Fiscal Year ending December 31, 2017 and results for the period of January through July, 2018. A true and correct copy of that statement (the "2018 YTD Statement") that Borrower delivered is attached hereto as Exhibit "N".

35. The delivery of the 2017 Statement was clearly late, as it was due March 31, 2018, pursuant to Paragraph 4.1.7(b) of the Loan Agreement.

36. The 2017 Statement was unaudited, in breach of the Loan Agreement. The 2018 YTD Statement was unaccompanied by the required certifications under the Loan Agreement.

37. Borrower as of August had failed to deliver any of the documents and other items required to be delivered on or before 45 days after each calendar quarter pursuant to Section 4.1.7(c) of the Loan Agreement. Borrower never cured that failure.

38. Borrower had until August 6, 2018 failed to deliver any rent roll since July 2017. A true and correct copy of the rent roll delivered by Borrower's counsel to Holder's counsel on August 6, 2018 is attached hereto as Exhibit "O".

39. The August 2018 rent roll was unaccompanied by the certification required from the Borrower under Section 4.1.7(d) of the Loan Agreement that the information provided is true, correct, accurate and complete.

40. The August 2018 rent roll is also inconsistent with the unaudited 2017 Statement. The 2017 Statement claims a net operating income of $1,297,966 and gross revenue (listed on the financial statement as "Total Income") of $1,796,673 for the Property; the August 2018 rent roll

shows a gross rent roll revenue of $830,752. Granted, the August 2018 rent roll purported to be current and the 2017 Statement was for the year ending December 31, 2017, but the August 2018 rent roll showed a precipitous decline so that current revenue was both less (a) in absolute terms than the net operating income reported for fiscal year 2017 and (b) by more than half of the "Total Income" reported for fiscal year 2017.

41. A comparison of the 2017 Statement and the 2018 YTD Statement is also instructive, and was instructive in Holder being able to obtain appointment of the Receiver. The Net Operating Income listed on the 2017 Statement is $1,297,966. The Net Operating Income on the 2018 YTD Statement is $128,252 - less than 10% of the 2017 Statement Net Operating Income. Granted, the 2018 YTD Statement only covers through July 2018. However, annualizing that income figure yields $219,860.57. Even that annualized figure is less than 17% of the Net Operating Income reported on the 2017 Statement.

42. The Total Income reported on the two statements showed a precipitous drop as well, declining from $1,796,673 on the 2017 Statement to $538,885 on the 2018 YTD Statement. That was a drop of over 70%. Even on a 2018 annualized basis Total Income figure of $923,802.86, the drop was over 48%.

43. For comparison purposes, attached as Exhibit "P" is a true and correct copy of the June 2017 rent roll previously delivered by Borrower. That June 2017 rent roll's total revenue is given as $2,526,992. This means that, in just over one year, the rental income decreased over 67%!

44. A further comparison of the two rent rolls from June 2017 and August 2018 is instructive. At least twelve tenants listed on the June 2017 rent roll should still have been in occupancy in August 2018 based on their lease end date that were no longer included on the August

2018 rent roll. Borrower never provided meaningful explanations for the absence of either these tenants or efforts to collect their rents.

45. The Borrower as of August 2018 had failed to deliver a copy of its tax return for fiscal year 2017. Borrower's counsel informed Holder's counsel in August 2018 that Borrower "has not filed its tax returns for year 2017 and therefore these numbers are still being reviewed by their accountant."

46. Until the delivery of the 2018 YTD Statement, the Borrower had also failed to deliver any financial statements for any period in 2018.

47. Repeatedly since May 2018, I had been demanding that Borrower deliver the required financial statements and rent rolls. As noted above, it was not until after the initial hearing on Holder's application for appointment of a receiver for the Property that we received the 2017 and 2018 Financial Statements and the most recent roll.

48. Further, upon information and belief, as of August 2018, Borrower had breached one or more covenants under Section 4.1.10 of the Loan Agreement (regarding Leases, their terms, conditions and enforcement, and in particular regarding tenant defaults). This can also be inferred from the precipitous drop in revenue as shown in the differences between the financial statement and the rent roll; some tenants had to have defaulted on their leases for such a drop to have occurred, but Borrower has not provided the required certifications to this effect.

**ADDITIONAL BORROWER MORTGAGED PROPERTY MISMANAGEMENT**

49. During the time that the Debtor was contesting appointment of the Receiver, Holder informed the State Court in October 2018 that Holder had not received proof that Borrower had paid the most recent premium for insurance coverage that was due on October 15, 2018. As a result, Holder was compelled to make and did make a protective advance to pay the insurance premium for the Mortgaged Property's insurance.

50. In addition, by October 2018, Holder had received reports that Borrower was hosting various one-time events at the Property (including some in the nature of parties and similar events) in lieu of obtaining new leases. These one-time events were consistently events where the attending customer paid cash. Borrower through the time of the Receiver's appointment had not paid a cent of proceeds from any of these events to Holder. Borrower has not sought consent from Holder for, and Holder has not consented to, the conduct of any of these events.

51. Some of these events created an atmosphere inconsistent with the professional commercial space that Borrower is obligated to operate under the Loan Documents. A review of the links attached hereto to events that I had learned as of October 2018 were being advertised for the Property will enable the links to speak for themselves as to the inconsistency with the professional environment that is required to be maintained at the Property.

52. The links included the following:

- https://www.eventbrite.com/e/lunar-tickets-43116968012
- https://www.facebook.com/events/957966994350798/
- https://sites.google.com/view/nyc-burning-man-decompression-
- https://nightout.com/events/disturbed/tickets
- https://www.facebook.com/events/896389987224943/
- https://www.tickettailor.com/events/skirtclubusa/132207
- https://donyc.com/events/2018/9/29/pool-party-brought-to-you-by-ready-made
- https://www.eventbrite.com/e/blockchain-law-accounting-tickets-50962373832?aff=ebdssbdestsearch

53. What I assumed in October 2018 (and what Tse did not deny) was his event company (55 Chrystie listed as the address) that appeared to be at the following internet address:

- https://sx1events.com/

54. These links reflect that Borrower was not through October 2018 doing new leases but rather was conducting events inconsistent with the character of the Property, to which Holder did not consent, all during which time Borrower was not remitting any of the proceeds to Holder.

55. Attached hereto as Exhibits "Q", "R" and "S" are true and correct copies of the transcripts in the State Court on the three hearings conducted by the State Court on Holder's motion to appoint the Receiver. The State Court gave repeated opportunities to the Borrower to demonstrate progress in obtaining new leases and the Borrower failed each time. Turning possession back to the Borrower now would only enable the pattern of futility that the Borrower established so definitively pre-petition to be renewed - all while exposing Holder to the risk that Borrower's "strategy" of holding one-time events of inappropriate character while keeping the cash will also re-emerge.

## FORECLOSURE JUDGMENT AND AMOUNTS DUE

56. Holder, by reason of the above Events of Default, accelerated the indebtedness due under the Loan Documents and commenced the Foreclosure Action. Debtor contested the Foreclosure Action, but the State Court granted Holder's motion for summary judgment and on April 8, 2019 entered a judgment of foreclosure and sale (the "Foreclosure Judgment"), a true and correct copy of which is attached hereto as Exhibit "T".

57. The Foreclosure Judgment amount is $33,073,255.48, together with interest thereon from December 5, 2018 at the default per diem rate of $7,337.19. This amount included tax advances, since the Debtor has not paid taxes. In addition, the Holder has made advances to the Receiver in the amount of $146,563.93, which advances are to be added to the amount of the Foreclosure Judgment under its terms and secured by the Mortgage. Debtor has made no payments on the Foreclosure Judgment.

I declare under penalty of perjury that the foregoing statements made by me are true and correct.

By: /s/ David Bornheimer
DAVID BORNHEIMER

Dated: May 2, 2019
Overland Park, Kansas