# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>C.T.W. REALTY CORP.,<br><br>                Debtor. | Chapter 11<br><br>Case No. 19-11425 (MKV)<br><br>Hearing Date: August 7, 2019 |

## SECURED CREDITOR'S SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF MOTION TO TERMINATE DEBTOR'S EXCLUSIVE PERIOD UNDER SECTION 11 U.S.C. §1121

PERKINS COIE LLP
30 Rockefeller Center, 22nd Floor
New York, New York 10112
(212) 262-6902
Email: geisenberg@perkinscoie.com
Attorneys for Wilmington Trust, N.A., as
Trustee for the Benefit of the Holders of
LCCM 2017-LC26 Mortgage Trust
Commercial Mortgage Pass-Through
Certificates, Series 2017-LC26

On the Brief:

    Gary F. Eisenberg

145174119.5

## TABLE OF CONTENTS

                                                            **Page**

PRELIMINARY STATEMENT ............................................................................................. 1

REPLY STATEMENT OF FACTS ........................................................................................ 2

ARGUMENT ............................................................................................................................ 3

    EXCLUSIVITY SHOULD BE TERMINATED BECAUSE THE REINSTATEMENT TRACK (III) RENDERS THE PLAN UNCONFIRMABLE ................................................................................................... 3

    *Why Track (iii) is Problematic and a Competing Plan is Needed to Avoid Unfair Prejudice to the Secured Creditor* ............................................................. 3

    *The Foreclosure Judgment Prevents Reinstatement* ............................................. 5

    *Even Absent the Foreclosure Judgment, Certain Defaults are Not Curable* ......... 7

CONCLUSION ....................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re 2712 Mission Partners, L.P.*,
  No. 08-32226 TEC, 2010 WL 431738 (Bankr. N.D. Cal. Jan. 22, 2010) .................................9

*In re Charter Commc'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................................................7

*In re Empire Equities Capital Corp.*,
  405 B.R. 687 (Bankr. S.D.N.Y. 2009) ........................................................................................9

*In re Masnorth Corp.*,
  36 B.R. 335 (Bankr. N.D. Ga. 1984) ..........................................................................................7

*In re NNN 3500 Maple 26, LLC*,
  No. 13-30402-HDH-11, 2014 WL 1407320 (Bankr. N.D. Tex. Apr. 10, 2014) ........................7

*In re Saint Peter's School*,
  16 B.R. 404 (Bankr. S.D.N.Y. 1982) ..........................................................................................5

*In re Young Broad.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010) ..........................................................................................7

**STATUTES**

11 U.S.C. § 1124 ..............................................................................................................................7

11 U.S.C. § 1124(2) .....................................................................................................................1, 5

11 U.S.C. § 1124(2)(A) ...................................................................................................................9

11 U.S.C. § 1124(2)(D) ...................................................................................................................6

11 U.S.C. §1129(a)(10) ...................................................................................................................5

11 U.S.C. §1129(a)(11) ...................................................................................................................5

145174119.5

Secured creditor Wilmington Trust, N.A., as Trustee for the Benefit of the Holders of LCCM 2017-LC26 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-LC26 ("Secured Creditor" or "Holder") submits this supplemental reply memorandum of law in support of its motion. Secured Creditor's motion (the "Motion") seeks entry of an order terminating the exclusive period of the debtor C.T.W. Realty Corp. ("CTW" or the "Debtor") to file a plan and solicit acceptances in this chapter 11 case.

## PRELIMINARY STATEMENT

1. The Debtor C.T.W. Realty Corp. ("CTW") or the ("Debtor") has, in response to the Motion, finally filed its proposed Plan of Reorganization (the "Plan"). The Plan implicitly invokes the memory of the late Monty Hall, host of the classic game show *Let's Make A Deal*, in proposing three possible avenues of treatment (each, a "Track") of the Secured Creditor's Allowed Claim. Track (i) provides for sale of the Property,[1] subject to the credit bid rights of the Secured Creditor ("Sale"); Track (ii) provides for refinancing to pay the Allowed Claim of Secured Creditor in full ("Refinance"); and Track (iii) provides for Reinstatement (in essence purporting to permit the Debtor to cure pursuant 11 U.S.C. § 1124(2)).[2]

2. Unlike Monty Hall in *Let's Make A Deal*, however, who generally offered the **contestant** held the option of choosing which door, box or curtain (or in this case, Track), the **Debtor** proposes to be the anti-Hall and reserve to itself the privilege to select which Track to

---

[1] The Property is the real property owned by the Debtor and located at 55-59 Chrystie Street, New York, New York. The Secured Creditor holds a foreclosure judgment (obtained in a contested foreclosure action) in the amount is $33,073,255.48, together with interest thereon from December 5, 2018 at the default per diem rate of $7,337.19 (the "Foreclosure Judgment").

[2] As will be demonstrated further below, Reinstatement is not actually achievable by the Debtor, and thus pursuit of Track (iii) of Reinstatement by the Debtor renders the Plan unconfirmable. Thus, since the Debtor's Plan is not confirmable as long as Track (iii) remains a Debtor option, the Court should grant the motion, terminate exclusivity and allow the Secured Creditor to propose its own plan - centered on Tracks (i) and (ii) alone.

145174119.5

take. However, since (as will be shown below) Reinstatement is not permissible, the Plan thus cannot be confirmed (unless the Court plays the role of Monty Hall and requires that the Track choice be that of the Secured Creditor, not the Debtor). Moreover, pursuit of Reinstatement is almost certain to negate the Debtor's pursuit of the other Sale and Refinance Tracks, thereby in essence converting what purports to be a three-Track Plan into a one-Track Plan that is unconfirmable. Accordingly, the Debtor's exclusive period should be terminated.

## REPLY STATEMENT OF FACTS

3. The following statement of facts will be limited to analysis of the elements of the Plan that are germane to the Court's determination of the Motion. However, certain facts relating to the unachievable nature of Reinstatement as supported by prior declarations filed in connection with the Motion papers previously filed by the Secured Creditor will be referenced as applicable below.

4. The Plan proposes the three Tracks as identified above. The Plan reserves the power to the Debtor to decide which Track to pursue. The three Tracks apply to treatment of the Secured Creditor's claim.[3]

5. The Plan provides for treatment of the claim of Titan Capital ID, LLC (the "Junior Lienor") in the original principal amount of $3,500,000.00 and secured by a junior mortgage lien (the "Junior Lien") as follows.[4] In a sale under Track (i), to the extent proceeds

---

[3] A plan that simply contained only Tracks (i) and (ii) would not be objectionable to the Secured Creditor (provided no amendments were filed to change the bidding procedures, delay the Plan process or otherwise sabotage what in the Plan as currently drafted appears to be a proposal for an actual sale -- were it not for the booby trap of Reinstatement and the lurking threat of withdrawal of the Plan should Reinstatement not occur).

[4] The mortgage of the Junior Lienor was impermissibly placed on the Property by the Debtor without the Secured Creditor's consent, an event of default that arose pre-petition. This is one of the barriers to Reinstatement.

2

145174119.5

are available after payment of the Secured Creditor, remaining funds will be distributed to the Junior Lienor up to the amount of the Junior Lienor's Allowed Claim, with any deficiency being treated as an unsecured claim. If Refinancing occurs under Track (ii), refinancing proceeds, instead of sale proceeds, will be distributed to the Junior Lienor in substantially the same manner as under Track (i), with any deficiency being treated as an unsecured claim. The Plan is somewhat undefined as to Junior Lien treatment under a Reinstatement.

6. The Plan proposes to distribute to general unsecured creditors (including holders of deficiency claims) their *pro rata* share of either the Sale Proceeds or the Refinancing Proceeds. The Plan appears to provide the same treatment in a Reinstatement.

7. The Plan references a "Distribution Fund" to consist of the Sale Proceeds, the Refinance proceeds and/or the capital proceeds supposedly raised in connection with a Reinstatement.

8. The Plan proposes to distribute anything remaining after distributions from the Distribution Fund to the holders of the equity interests in the Debtor. Section 4.3 of the Plan provides a wind-down mechanism for the Debtor, but that appears to be inconsistent with how the Debtor would purportedly operate were there to be a Reinstatement.

9. The Debtor has not filed yet a disclosure statement with the Plan. Accordingly, many of the questions regarding means for implementation necessarily remain unanswered at this point.

## **ARGUMENT**

### EXCLUSIVITY SHOULD BE TERMINATED BECAUSE THE REINSTATEMENT TRACK (III) RENDERS THE PLAN UNCONFIRMABLE

*Why Track (iii) is Problematic and a Competing Plan is Needed to Avoid Unfair Prejudice to the Secured Creditor*

3

10. The Secured Creditor anticipates that the Court will ask what is problematic about the Plan given its provision for Tracks (i), (ii) and (iii). The problem is simple. The Secured Creditor believes that the Debtor's principal in fact is unwilling to have the Property sold, is not likely to achieve a Refinancing (given failure to do so pre-petition) and thus can be expected to persist, Don Quixote-style, in pursuing a Reinstatement that is not achievable. Even though the Plan purports to contemplate the commencement of the Sale process now, the Secured Creditor's concern is that the Debtor will make a show of pursuing the Sale process, but at the end of 120 days, not wanting to sell the Property, will attempt to pursue an unachievable Reinstatement, be unable to obtain Reinstatement and thus withdraw the Plan, with the result that none of the Tracks happens. This will result in the Secured Creditor being subject to a 120-day delay for no good purpose, while operating losses mount, when a Sale would avert the need for the Secured Creditor to start its own plan process after the Debtor's confirmation efforts fail.

11. Reinstatement is not going to be permitted for the reasons set forth below. But if the Debtor is denied Reinstatement and then elects to withdraw the Plan, all that will result is delay. This can be avoided by the Secured Creditor being granted leave to file its own plan, so that a Sale can occur even if the Debtor seeks a Reinstatement that is denied and then tries to hold up all of the creditors by withdrawing the Plan when Reinstatement fails, thereby imposing more delay.[5]

---

[5] In response to the Debtor's anticipated argument that two simultaneous Sale processes could be confusing, the Secured Creditor is agreeable to its Plan providing for "piggy-backing" on the Debtor's Sale process, subject to Court jurisdiction over any dispute regarding the Sale process to ensure that it not be booby-trapped to the Secured Creditor's detriment. In such a process, the Secured Creditor would not seek to have the Court approve a second broker to do the same Sale process if the Debtor's broker is capable. Admittedly, the Secured Creditor would have preferred that the Debtor retain a broker previously presented by the Debtor. However, the Secured Creditor recognizes that, as long as conflicts are not manifest and a broker presented by the Debtor satisfies the Court as to competence, the Court is unlikely to allow the Secured

4

12. The requirements for confirmation necessitate granting the Secured Creditor leave now to file its own plan. This is because, should all of the classes of impaired creditors reject the Plan, a plan filed by the Secured Creditor that contemplates a Sale will constitute a plan that impairs the Secured Creditor. As a result, its vote to accept its own plan will enable the Secured Creditor plan to satisfy 11 U.S.C. §1129(a)(10) (requiring acceptance by one impaired non-insider class of creditors). Again, this enables the Secured Creditor to avoid unfair imposition of a delay if the Plan is not confirmed. The Court should keep in mind that, if Reinstatement is not permitted and the Debtor otherwise does not pursue Sale or Refinance, the Plan that the Debtor has filed will of course lack adequate means for implementation, not be feasible and fail to satisfy 11 U.S.C. §1129(a)(11).

*The Foreclosure Judgment Prevents Reinstatement*

13. Reinstatement is not achievable because of the entry of the Foreclosure Judgment. The Foreclosure Judgment fixes the allowed amount of the Secured Creditor's claim in the amount of $33,073,255.48, together with interest thereon from December 5, 2018 at the default per diem rate of $7,337.19, plus other costs, fees and expenses as provided in the Foreclosure Judgment.

14. Because of the entry of the Foreclosure Judgment, there is nothing for the Debtor to "reinstate" other than its obligation to pay the Foreclosure Judgment amount immediately or be subject to judicial sale (the status of the situation immediately prior to its filing of this case). Because of the entry of the Foreclosure Judgment, the Debtor may not reinstate the Mortgage

---

Creditor to substitute its broker preference for that of the Debtor. That broker can proceed with the Sale process. Even so, nothing would prevent the Secured Creditor from encouraging its broker contacts to attempt to further a Sale.

5

and "cure" the defaults. *In re Saint Peter's School*, 16 B.R. 404, 409–10 (Bankr. S.D.N.Y. 1982). There, the court reasoned:

> Had the bank not obtained a judgment, deceleration would be permitted under Code § 1124(2). However, the existence of the judgment of foreclosure into which the mortgage was merged, cannot simply be ignored. The foreclosure judgment provides the bank with an additional right to immediate realization of its legal, equitable and contractual interests. A deceleration of the mortgage would "otherwise alter the legal, equitable, or contractual rights to which such claim or interest (the judgment of foreclosure) entitled the holder of such claim or interest" as proscribed under Code § 1124(2)(D).

15. Indeed, it is settled law in New York that a mortgage merges into a foreclosure judgment. *Taylor v. Wing*, 84 N.Y. 471, 477 (1881) ("After the entry of judgment of foreclosure the plaintiff was entitled to interest upon the sum found to be due upon the mortgages, not by virtue of the mortgages, but by virtue of the judgment in which the mortgages became merged."); see also *Campbell v. Smith*, 309 A.D.2d 581, 768 N.Y.S.2d 182 (1st Dept. 2003). ("The notice of pendency thus alerts the public that the mortgage will be merged into the judgment of foreclosure."); *City Real Estate Co. v. MacFarland*, 67 Misc. 286 (Sup. Ct. N.Y. County 1910). As a result of the merger of the Secured Creditor's mortgage into the Foreclosure Judgment, the Debtor can redeem, but only by paying the full amount of the Foreclosure Judgment, not the amounts of the missed payments. See *Grady v Utica Mut. Ins. Co.*, 69 A.D.2d 668, 677 (2d Dept. 1979) ("The rule in New York is that as between the parties to the mortgage and their assigns, a judgment of foreclosure is conclusive as to the amount of the mortgagee's lien on the premises…"); *Belsid Holding Corp. v Dahm*, 12 A.D.2d 499, 500 (2'd Dept. 1960) (redemption amount is "not merely the total of the installments of principal and interest as to which there had been a default in payment").

16. The State Court determined the amount of the Foreclosure Judgment, and thus it is the Foreclosure Judgment that the Debtor must pay, not merely defaulted installments. As

6

noted by the Secured Creditor previously (docket no. 39, ¶¶ 20 - 24), the principles of *res judicata* and the Rooker-Feldman doctrine both render "resolved" what the Debtor tries to claim is an "unresolved contingency" as to the allowance of the yield maintenance component of the Foreclosure Judgment. Moreover, once the Foreclosure Judgment has been entered, the merger renders unachievable any "cure" or "reinstatement." Under New York law, foreclosure judgments cannot be cured or reinstated other than by payment in full (which would be Refinance under Track (ii), not Reinstatement under Track (iii)). Thus, Reinstatement is unachievable as a matter of law.

*Even Absent the Foreclosure Judgment, Certain Defaults are Not Curable*

17.     As the Court is aware, numerous defaults existed pre-petition. Many of them existed as of the time of, and their existence prompted the State Court to issue, the Receiver Order.

18.     These were not immaterial defaults. They went beyond payment defaults.

19.     These include the following, among others:

Failure to obtain a certificate of occupancy

Permitting the lapsing of approvals

Gutting the tenant rolls, leaving a substantially vacant Mortgaged Property

Granting the Junior Lien

Incurring building code violations

Failure to maintain the Mortgaged Property

20.     The Debtor must cure them all in order to achieve "Reinstatement." As the previous submissions by the Secured Creditor show, cure is virtually impossible with respect to

7

145174119.5

several of them. Cure of all of them is less probable than a landing on another solar system in our lifetime.

21.     Courts require non-monetary defaults to be cured for a Plan to be confirmed. *See, e.g.*, *In re Young Broad.*, 430 B.R. 99, 115 (Bankr. S.D.N.Y. 2010) (evaluating whether plan results in a change of control that constitutes a default under credit agreement that has not been cured, precluding reinstatement of the loan); *In re Charter Commc'ns*, 419 B.R. 221, 249 (Bankr. S.D.N.Y. 2009) (evaluating whether plan triggered change of control default under credit agreement after creditor objected on the basis of an uncured default); *see also In re NNN 3500 Maple 26, LLC*, No. 13-30402-HDH-11, 2014 WL 1407320, at *5 (Bankr. N.D. Tex. Apr. 10, 2014) (stating "*any* change in the arrangement between the debtor and creditor constitutes impairment" before holding that the plan's proposed change in borrower under the loan documents constitutes an uncured default precluding reinstatement) (emphasis in original); *In re Masnorth Corp.*, 36 B.R. 335, 340 (Bankr. N.D. Ga. 1984) (stating that section 1124 requires the cure of all non-monetary defaults and holding that loan could not be reinstated unless Debtor complied with its contractual duty to maintain the subject property).

22.     Thus, unless the Debtor can cure **all** of the non-monetary defaults, Reinstatement is not an option. As shown below, the Debtor faces serious obstacles to curing all of its pre-petition non-monetary defaults.

<u>Failure to obtain a certificate of occupancy</u>

23.     The Debtor failed to obtain a certificate of occupancy pre-petition. The absolute deadline for doing so is August 10, 2019, which is 30 months after the date of the Loan

Agreement, February 10, 2019.[6] *See* Bornheimer Decl. Exh. A (docket no. 5-8), Section 4.1.20. The Debtor is not going to meet that deadline, leaving it without a certificate of occupancy timely procured, an ongoing and uncurable Event of Default.

Permitting the lapsing of approvals; incurring building code violations

24. Moreover, the Debtor has rendered itself incapable of obtaining a certificate of occupancy. The Debtor allowed certain permits to lapse pre-petition. The Debtor failed to cure numerous building code violations prepetition. As the Receiver has made clear, his expediter, Municipal Building Consultants, Inc., has informed the Receiver that the Debtor appears to have failed to have completed the process of conversion of the Mortgaged Property from factory to office complex within five years of obtaining approvals in 2008, and thus may have jeopardized the continuing viability of the 2008 approvals. Moreover, the New York Department of Buildings ("DOB") has not committed to reinstating the prior approvals, particularly if the DOB has to work with Tse. *See* Gilfoil Decl. (docket no. 5-2) at ¶¶ 12 - 15.

25. In addition, the Debtor incurred numerous violations pre-petition, which likely the DOB will require to be cured as a condition of any reinstatement of approvals. Thus, it is both Tse's track record and his inability to cure the violations that makes the approvals reinstatement unlikely if the Debtor recovers possession. *Ibid*.

26. One of the permits the Debtor permitted to lapse was for outdoor billboard advertising. That failure resulted in lapse of the permit, which cannot be renewed or reinstated. This resulted in the Receiver losing an outdoor billboard tenant who was otherwise prepared to

---

[6] The deadline is actually February 10, 2019, 24 months after the date of the Loan Agreement, and the Debtor is only entitled to an additional six months in the Lender's absolute discretion if the Debtor is taking meaningful steps to procure the certificate of occupancy. Since the Debtor has, upon information and belief, not done so, the time has already run, but in any event the absolute deadline is three days after the August 7, 2019 hearing date on the Motion.

9

145174119.5

pay $100,000 per year to rent the advertising space. *Id*. at ¶16. This is an act of omission that empowers the city government to effectuate a forfeiture of the permit, which results in another incurable default under Section 4.1.2 of the Loan Agreement. *See* Bornheimer Decl. Exh. A (docket no. 5-8), ¶4.1.2.

<u>Gutting the tenant rolls, leaving a substantially vacant Mortgaged Property</u>

27. The Debtor pre-petition gutted the tenant rolls, which resulted in the annual revenues for 2017 of just under $1,800,000 (*see* Bornheimer Decl. [docket no. 5-4], ¶¶ 40 - 42), declining to just over $10,000 per month as the Receiver has taken control (*see* Gilfoil Decl. [docket no. 5-2], ¶10). Such a scorched-earth approach to property management runs afoul of the bar under Section 4.10(b) of the Loan Agreement against the Debtor terminating Leases without Lender approval. *See* Bornheimer Decl. Exh. A [docket no. 5-8], section 4.1.10(b).

<u>Granting the Junior Lien</u>

28. The Debtor must also cure the default arising out of the granting of the Junior Lien (an Event of Default by reason of breach of Section 4.2.2 of the Loan Agreement). *See* Bornheimer Decl. Exh. A (docket no. 5-8), section 4.2.2. The Plan does not propose that, and thus cannot be confirmed for that reason well. See *In re 2712 Mission Partners, L.P.*, No. 08-32226 TEC, 2010 WL 431738, *3–4 (Bankr. N.D. Cal. Jan. 22, 2010). In that case, the senior lender objected to confirmation of the debtor's plan on the basis that the debtor's plan did not propose to cure the breach of the covenant barring junior encumbrances. Id. at *3. The bankruptcy court agreed, sustaining the objection after reasoning that "section 1124(2)(A) requires the cure of almost all non-monetary defaults." Id. at *3 (citing *In re Empire Equities Capital Corp.*, 405 B.R. 687, 690–91 (Bankr. S.D.N.Y. 2009)). The court noted that the only way the debtor could cure the default would be to repay the second deed of trust, thus bringing it

in compliance with the loan documents. Since the Plan does not so provide, it cannot be confirmed.

<u>Failure to maintain the Mortgaged Property</u>

29. The Debtor also suffered the substantial deterioration of the Mortgaged Property's physical condition. *See* Gilfoil Decl. (docket no. 5-2) at ¶ 10. This runs afoul of Section 4.1.2 of the Loan Agreement as well, as this section requires the Debtor to keep the Mortgaged Property in good repair and working order and make all necessary repairs thereto. *See* Bornheimer Decl. Exh. A (docket no. 5-8), ¶4.1.2. Suffice to say, the Debtor's defaults under this section will require substantial expenditures to cure, and the Debtor has not demonstrated that it can or will infuse the funds or effort to do so.

30. The net result of the litany of the Debtor's disasters is the following. The Debtor gutted the Mortgaged Property pre-petition, in terms of depleted rent roll, deteriorated physical condition, lapsed permits and lack of a certificate of occupancy. The Debtor does not address ongoing operating deficits. Instead, the Debtor seeks to string along all of the interested parties in this case.

31. Its elixir for doing so is a false hope of unachievable "Reinstatement." This creates jeopardy to the Secured Creditor that, when the Debtor fails to achieve Reinstatement, the Debtor will withdraw the Plan. This will hold up the Secured Creditor for additional months (with additional operating losses) from pursuing the proper course of action in this case, a sale of the Mortgaged Property.

32. The hope of Reinstatement is false for two reasons. First, given the Foreclosure Judgment, there is nothing to reinstate. Second, the litany of required cures is so extensive as to render any hope by the Debtor of Reinstatement fantastically unrealistic. The cure for this

myopia is simple - termination of the Debtor's exclusivity so that the Secured Creditor can propose its own plan, thereby protecting it from further costly delays when, as has to be expected, Reinstatement does not occur and both Sale and Refinance are, anti-Monty Hall style, withdrawn by the Debtor as it plays *Let's **Not** Make a Deal*.

## CONCLUSION

33.    For the foregoing reasons, the Secured Creditor respectfully requests that this Court enter an Order terminating the Debtor's exclusive periods for filing and soliciting acceptances of a plan in this bankruptcy case.

Dated: August 5, 2019
      New York, New York

COUNSEL FOR WILMINGTON TRUST, N.A.,
AS TRUSTEE FOR THE BENEFIT OF THE
HOLDERS OF LCCM 2017-LC26
MORTGAGE TRUST COMMERCIAL
MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2017-LC26

/s/ *Gary F. Eisenberg*
PERKINS COIE LLP
30 Rockefeller Plaza
22nd Floor
New York, New York 10112
Tel: (212) 262-6900
Fax: (212) 977-1649
Gary F. Eisenberg
geisenberg@perkinscoie.com

145174119.5