## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>C.T.W. REALTY CORP.,<br><br>                       Debtor. | Chapter 11<br><br>Case No. 19-11425 (MKV)<br><br>Hearing Date:  September 12, 2019, 10:00 a.m. |

## OBJECTION OF WILMINGTON TRUST, N.A. AS TRUSTEE TO DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION BY C.T.W. REALTY CORP.

PERKINS COIE LLP
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
(212) 262-6902
Email:  geisenberg@perkinscoie.com
Attorneys for Wilmington Trust, N.A., as
Trustee for the Benefit of the Holders of
LCCM 2017-LC26 Mortgage Trust
Commercial Mortgage Pass-Through
Certificates, Series 2017-LC26

On the Brief:

    Gary F. Eisenberg

145525936.5

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

Reinstatement Is Impairment ............................................................................. 1

Failure to Treat Reinstatement as Impairment Exacerbates Inadequacy of
Information ................................................................................................... 3

BACKGROUND ................................................................................................ 6

OBJECTION .................................................................................................... 8

    A.    Approval Should Be Denied Based on Patently Unconfirmable Plan ................... 8

        i.    Improper Disenfranchisement of Secured Creditor ................................. 10

        ii.    Mortgage Merges Into Foreclosure Judgment Under New York
Law ..................................................................................................... 12

        iii.    Foreclosure Judgment Provides Rights Beyond Mortgage...................... 14

        iv.    Paying Class 2 Before Paying the Foreclosure Judgment Is
Impairment ........................................................................................... 15

        v.    Proposed Release of Tse Unconfirmable ................................................. 16

    B.    Approval Should Be Denied Based on Lack of Adequate Information.............. 17

        i.    No Disclosure Regarding Numerous Defaults........................................ 17

        ii.    No Liquidation Analysis ......................................................................... 19

        iii.    How Does the Debtor Operate post-Reinstatement If Wound
Down? ................................................................................................... 20

        iv.    Which Track Will the Debtor Choose, and How? ................................. 20

        v.    Other Disclosure Shortcomings ............................................................. 21

# TABLE OF AUTHORITIES

**Page**

C ASES

*Belsid Holding Corp. v Dahm,*
    12 A.D.2d 499 (2d Dept. 1960) ............................................................................................14

*Bernhardt v. Polygraphic Co. of America,*
    350 U.S. 198 (1956)..............................................................................................................13

*Campbell v. Smith,*
    309 A.D.2d 581 (1st Dept. 2003)..........................................................................................11

*Dulberg v. Ebenhart,*
    68 A.D.2d 323 (N.Y. App. Div. 1979) .............................................................................12, 13

*Grady v. Utica Mut. Ins. Co.,*
    69 A.D.2d 668 (2d Dept. 1979) ............................................................................................13

*Howard v. Robbins,*
    67 A.D. 245 (4th Dept. 1901) ..............................................................................................11

*In re 231 Fourth Ave. Lyceum, LLC,*
    513 B.R. 25 (Bankr. E.D.N.Y. 2014)....................................................................................17

*In re 2712 Mission Partners, L.P.,*
    2010 WL 431738 (Bankr. N.D.Cal. 2009).............................................................................15

*In re Acevedo,*
    26 B.R. 994 (E.D.N.Y. 1982) ....................................................................................12, 13, 14

*In re Am. Capital Equip., LLC,*
    688 F.3d 145 (3d Cir. 2012)...................................................................................................9

*In re Atl. Terrace Apt. Corp.,*
    226 B.R. 535 (Bankr. E.D.N.Y. 1998)....................................................................................9

*In re Charter Commc'ns,*
    419 B.R. 221 (Bankr. S.D.N.Y. 2009)..............................................................................15, 18

*In re Copy Crafters Quickprint, Inc.,*
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) .....................................................................................9

*In re GSC, Inc.,*
    453 B.R. 132 (Bankr. S.D.N.Y. 2011).....................................................................................9

## TABLE OF AUTHORITIES
(continued)

**Page**

*In re Kehn Ranch, Inc.*,
    41 B.R. 832 (Bankr. S.D. 1984)..............................................................................................9

*In re Kumari*,
    Case No. 18-40130-CEC, 2019 WL 1423083 (Bankr. E.D.N.Y. Mar. 27,
    2019) ......................................................................................................................................13

*In re Main St. AC, Inc.*,
    234 B.R. 771 (Bankr. N.D. Cal. 1999) ...................................................................................9

*In re Moody Nat. SHS Hous. H, LLC*,
    426 B.R. 667 (Bankr. S.D. Tex. 2010) .................................................................................15

*In re Pecht*,
    53 B.R. .....................................................................................................................................9

*In re Quigley Co.*,
    377 B.R. 110 (Bankr. S.D.N.Y. 2007)....................................................................................9

*In re R&G Props., Inc.*,
    No. 08-10876, 2009 WL 2043873 (Bankr. D. Vt. July 6, 2009) .............................................9

*In re Saint Peter's Sch.*,
    16 B.R. 404 (Bankr. S.D.N.Y. 1982)......................................................................11, 12, 13

*In re Sanders*,
    408 B.R. 25 (Bankr. E.D.N.Y. 2009).....................................................................................18

*In re Taddeo*,
    685 F.2d 24 (2d Cir. 1982)....................................................................................................13

*In re Valrico Square Ltd. P'ship*,
    113 B.R. 794 (Bankr. S.D. Fla. 1990) ....................................................................................9

*In re Young Broad.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010).............................................................................15, 18

*Law v. Siegel*,
    571 U.S. 415 (2014)..............................................................................................................14

*Monday Props., Inc. v. A-1 Plumbing & Heating Co.*,
    25 Misc. 2d 625 (N.Y. Sup. Ct. 1960) ............................................................................12, 13

145525936.5

# TABLE OF AUTHORITIES
(continued)

Page

*NYCTL 1999-1 Trust v. 573 Jackson Ave. Realty Corp.*,
  13 N.Y.3d 573 (2009) ................................................................................14

*Prudence Co. v. 160 W. Seventy-Third St. Corp.*,
  183 N.E. 365 (N.Y. 1932) ......................................................................12, 13

*Taylor v. Wing*,
  84 N.Y. 471 (1881) ...........................................................................10, 12, 13

## STATUTES

11 U.S.C. § 105 .......................................................................................9

11 U.S.C. § 362(a) ..................................................................................14

11 U.S.C. § 524(e) ...............................................................................3, 17

11 U.S.C. § 543 ...................................................................................6, 7

11 U.S.C. §§ 701-784 ......................................................................3, 19, 20

11 U.S.C. §§ 1101-1174 ...........................................................................19

11 U.S.C. § 1124 .................................................................................2, 4

11 U.S.C. § 1124(2) ................................................................................11

11 U.S.C. § 1124(e) ................................................................................10

11 U.S.C. § 1125 ..............................................................................3, 8, 17

11 U.S.C. § 1125(a)(1) .............................................................................17

11 U.S.C. § 1126(a) .................................................................................2

11 U.S.C. § 1126(g) .................................................................................4

11 U.S.C. § 1129 ....................................................................................8

11 U.S.C. § 1129(a)(1) ...........................................................................2, 4

11 U.S.C. § 1129(a)(2) ...........................................................................2, 4

11 U.S.C. § 1129(b) .............................................................................5, 16

**TABLE OF AUTHORITIES**
(continued)

**Page**

11 U.S.C. § 1129(b)(2)(B) ........................................................................................................20

11 U.S.C. §§ 1301-1330 ...........................................................................................................12

145525936.5

Wilmington Trust, N.A., as Trustee for the Benefit of the Holders of LCCM 2017-LC26 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-LC26 (the "Secured Creditor") hereby submits this objection to the Disclosure Statement for Plan of Reorganization by C.T.W. Realty Corp. Pursuant to Chapter 11 of the Bankruptcy Code ("Disclosure Statement") [Docket No. 47] filed by the Debtor C.T.W. Realty Corp. ("Debtor") and to the motion (the "Motion") [Docket No. 46] by the Debtor to approve the Disclosure Statement, and in support thereof, respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The plan of reorganization (the "Plan") for which the Debtor has submitted the Disclosure Statement is facially unconfirmable.  For that reason alone, the Court should not approve the Disclosure Statement and should deny the Motion.

2.      It is axiomatic that the Court should not approve a disclosure statement that describes a plan that cannot be confirmed.  To do otherwise would be to approve a costly but fruitless exercise in solicitation, knowing that, regardless of the votes, plan confirmation will not occur.  Yet, this is exactly what the Debtor has requested in the present case.

3.      In addition, the Disclosure Statement lacks adequate information to permit an informed decision about accepting or rejecting the plan to which it relates.  Moreover, several of the plan's provisions are confusing to the point where adequate information about them is basically impossible to provide.

*Reinstatement Is Impairment*

4.      As set forth below, the Plan for which the Disclosure Statement has been filed cannot be confirmed.  The Plan impermissibly proposes to reinstate the Secured Creditor's merged foreclosure judgment and treat such reinstatement ("Reinstatement") as lack of impairment

-1-

pursuant to 11 U.S.C. § 1124.  The effect of such claimed lack of impairment would be to disenfranchise the Secured Creditor, as if its acceptance of the Plan were not to need to be solicited and the effect of its rejection of the Plan were able to be disregarded by the Court.

5.      Doing so runs afoul of Section 1126(a) of the Bankruptcy Code, which recognizes that the holder of a claim that is impaired may reject a plan.  Denying the Secured Creditor its right to reject the Plan and have the consequences of that rejection be evaluated by the Court is a failure of the plan and its proponent to comply with applicable provisions of title 11.  That renders the Plan unconfirmable because it does not satisfy Section 1129(a)(1) or (a)(2) of the Bankruptcy Code (requiring the plan and the proponent to comply with the Bankruptcy Code's provisions).

6.      The Plan's Reinstatement track is an effort to pay the Secured Creditor less than the amount determined by judgment by a state court of competent jurisdiction, deny the Secured Creditor its right to compel a judicial sale if the amount of the foreclosure judgment is not paid and to continue indefinite breach of a critical loan covenant, all over the Secured Creditor's objection.  Despite the alteration of fundamental rights that the Reinstatement track proposes to implement, the Plan further provides that the Secured Creditor's interest is unimpaired by these proposed changes and thus the Secured Creditor is ineligible to vote to reject the Plan.  However, as shown below, the proposed Reinstatement must be considered to render the Secured Creditor's claim "impaired" within the meaning of 11 U.S.C. § 1124.  Thus, the Plan's proposed treatment of the Secured Creditor's claim as Unimpaired results in a failure to permit the Secured Creditor to accept or reject the Plan, contrary to 11 U.S.C. § 1126(a).

7.      Reinstatement would fundamentally alter the legal and equitable rights of the Secured Creditor.  Further, the Debtor ignores the fact that the mortgage that the Debtor seeks to

reinstate has merged into the foreclosure judgment, which if modified by Reinstatement is plainly an alteration of the legal and equitable rights of the Secured Creditor.

8.       Reinstatement is in substance an impermissible effort to strip from the Secured Creditor's allowed claim the portion of the foreclosure judgment that includes a prepayment premium of $5,208,873.11.  The State Court awarded that amount in a contested foreclosure action. The Plan appears not to state expressly that it seeks to avoid paying this prepayment premium. But, any effort to alter the Secured Creditor's right to receive the prepayment premium that the State Court awarded cannot be accomplished in a way that renders the Secured Creditor's claim other than impaired, and thus the Secured Creditor is entitled to reject the Plan.

9.       In addition, the Plan proposes to give releases of the Secured Creditor's claims against the Debtor's principal Gary Tse.  Tse has executed and delivered to the Secured Creditor a guaranty instrument (the "Guaranty") that provides for full recourse liability in a number of circumstances, including (relevant here) granting a junior mortgage on the Mortgaged Property without Secured Creditor's consent.  Granting such a release is impermissible under 11 U.S.C. § 524(e) and thus the Plan cannot be confirmed.  But, even if it were confirmable, how can the Debtor maintain that releasing Tse from liability to the Secured Creditor for obligations already triggered under the guaranty is not impairment of the legal rights of the Secured Creditor?

*Failure to Treat Reinstatement as Impairment Exacerbates Inadequacy of Information*

10.       In addition, the Disclosure Statement itself lacks "adequate information," as that term is defined in section 1125 of the Bankruptcy Code.  The Disclosure Statement does not provide a liquidation analysis so that creditors can make an informed decision as to what they will receive under the Plan as compared with likely receipt under alternatives, particularly under Chapter 7.  Particularly since the Plan does not state what the proposed distribution to creditors is

-3-

under a Reinstatement or a Refinance, the lack of a liquidation analysis compounds the inadequacy of the information that holders of impaired claims are entitled to receive in order to determine whether to accept or reject the Plan.

11.     Of course, the Plan for which Disclosure Statement has been submitted also improperly classifies the Secured Creditor's claim (which is properly in its own class) as Unimpaired (defined in the Plan as not impaired within the meaning of Section 1124 of the Bankruptcy Code).  As a result, the Plan improperly would deny the Secured Creditor the ability to reject the Plan, and the Disclosure Statement fails to discuss the consequences to potential confirmation of the Plan if the Secured Creditor rejects the Plan.

12.     The Disclosure Statement also fails to describe how the Debtor will continue to exist and operate if Reinstatement were to occur (section 4.3 of the Plan provides for a wind-down of the Debtor and makes no exception in the event of a Reinstatement).[1]

13.     Puzzlingly, the Plan also provides for Class 4 (holders of interests in the Debtor) to receive their *pro rata* share of the Distribution Fund (defined in the Plan to mean, in the case of Reinstatement, "if applicable, any Cash on hand, and … if applicable, the proceeds of any capital raise or other similar transaction received or closed by the Debtor to fund the Plan.").  Yet, the Plan treats Class 4 as deemed to reject the Plan and not entitled to vote.  That treatment is irreconcilable with Section 1126(g) of the Bankruptcy Code, which deems a class to reject a plan

---

[1]   The Secured Creditor is in principle unopposed to the non-existence of the Debtor after confirmation of the Plan, but not if a Reinstatement occurs.  Yet, Reinstatement must, even under the Debtor's perception of reality under the Bankruptcy Code, include continued compliance with the obligations to the Secured Creditor.  These obligations include various covenants regarding preservation of the Debtor's existence.  Thus, the Reinstatement proposed under the Plan is incompatible with the proposed treatment of the Debtor and its interest holders under the Plan!

145525936.5

only if the holders are not to "receive or retain any property under the plan on account of such claims or interests."

14.    Perhaps the proposed treatment of the Secured Creditor as Unimpaired in the event of a Reinstatement coupled with deemed rejection by the holders of interests in the Debtor is an effort by the Debtor to avoid having to address pursuit of confirmation under the "cram-down" provisions of Section 1129(b) (which only apply when a plan is not accepted by all of the impaired classes).  Perhaps the Debtor is concerned that having to solicit acceptances in the face of a possible need to seek "cram-down" will discourage creditors from accepting the Plan.  If so, the Disclosure Statement is misleading and should not be approved.

15.    In addition, another puzzling item under the Plan emerges.  If, as the Plan provides, the only distribution to Class 4 interests is the Distribution Fund, then, if a Refinance occurs, who owns the equity in the Debtor?  And, if the Debtor does a Refinance, how will the Debtor continue to function in servicing the refinanced claims, particularly if the Debtor is to be wound down under Section 4.3 of the Plan?

16.    And, the inverse question also must be asked.  If the Debtor is to be wound down under Section 4.3 of the Plan, why does Reinstatement make any sense?  In fact, why would Refinance make any sense?  Is the Debtor seeking to conceal from the creditors that its current interest holders will be the interest holders going forward in the event of Reinstatement or Refinance?  But how can that be if their treatment on account of their interests is merely receipt of their *pro rata* share of the Distribution Fund?  And, if the Debtor is so hopelessly confused, how could a Reinstatement possibly work in any event? [2]  Given the inherent internal inconsistencies

---

[2]  These are not trivial concerns.  The Debtor's principal Gary Tse is the current holder of the interests and a guarantor under certain circumstances of the Secured Creditor's claim.  If a Reinstatement were to occur, would Tse no longer have those interests, so that in the event of a subsequent default triggering full

in the Plan, no disclosure statement could contain adequate information to explain these unexplainable items.  Thus, the Disclosure Statement should not be approved.

## **BACKGROUND**

17.     The facts summarized below are based on the Declarations of Gregory A. Gilfoil and David Bornheimer, filed in support of the Secured Creditor's motion to excuse the receiver from compliance with section 543 of the Bankruptcy Code and dated May 2, 2019.  The Secured Creditor has filed a request for the Court to take judicial notice of these Declarations.

18.     Briefly stated, the Secured Creditor is the holder of a loan made to the Debtor in February 2017 in the original principal amount of $25,125,000.00.  The loan was evidenced by a note (the "Note") and secured by a first-priority mortgage (the "Mortgage") over the Mortgaged Property[3] owned by the Debtor.

19.     Less than one year after receiving the loan, the Debtor defaulted on the Note and Mortgage by placing a second mortgage on the Mortgaged Property without the Secured Creditor's consent.  In addition, during the year leading up to the Debtor's payment default on the Note, the Debtor vitiated the viability of the Mortgaged Property's economics, presiding over a precipitous decline in revenues and occupancy while concealing this from the Secured Creditor by not providing financial statements or rent rolls.  To make matters worse, the Debtor engaged in a pattern of conducting one-time events at the Mortgaged Property inconsistent with the Mortgaged Property's character as a professional office building.  As a result of these defaults, the Secured

---

recourse liability to Tse, enforcement of rights respecting his membership interests would become unavailing?

[3]     The Mortgaged Property is commonly known as 55-59 Chrystie Street, New York, New York 10002-5042 and further identified as Block 303 Lot 27 in the Borough of Manhattan as shown on the City of New York Tax Map, in the County of New York, State of New York.

145525936.5

Creditor moved for the appointment of a receiver in the Supreme Court of New York, New York County (the "State Court"). Shortly thereafter, the Secured Creditor also moved for entry of a judgment of foreclosure of the Mortgage and judicial sale of the Mortgaged Property, which the State Court entered on April 8, 2019 (the "Foreclosure Judgment"). The Foreclosure Judgment amount was determined at $33,073,255.28, together with interest thereon from December 5, 2018 at the default per diem rate of $7,337.19. No appeal was taken on the Foreclosure Judgment amount, and the Mortgage merged with the Foreclosure Judgment upon entry of the latter.

20.     The Secured Creditor arranged for publication of notice for a scheduled judicial sale by the referee appointed by the State Court, to be conducted on May 2, 2019. On May 1, 2019, the day before the referee's sale, the Debtor filed its petition to commence this chapter 11 case.

21.     On June 4, 2019, the Court entered an order [Docket No. 21] granting the Secured Creditor's motion to excuse compliance by Greg Gilfoil, the State Court-appointed receiver (the "Receiver") from compliance with turnover of the Mortgaged Property pursuant to Section 543 of the Bankruptcy Code. The Receiver continues to manage and operate the Mortgaged Property.

22.     On August 20, 2019, the Court granted the Secured Creditor's motion for leave to make protective advances to pay Mortgaged Property expenses (both pre- and post-petition). The Secured Creditor has made substantial advances post-petition and expects to need to continue to do so, as the Mortgaged Property's revenue was eviscerated by the Debtor pre-petition.

23.     On July 30, 2019, the Debtor filed the Plan. On August 13, 2019, the Debtor filed the Disclosure Statement in support of the Plan. As set forth in the Disclosure Statement, the Plan proposes three possible avenues of treatment of the Secured Creditor's claim: (i) payment pursuant to a sale of the Mortgaged Property ("Sale"); (ii) payment of the Secured Creditor's claim in full

-7-

pursuant to a refinancing of the Mortgaged Property ("Refinancing"); or (iii) reinstatement of the mortgage with payment continuing according to the now-merged original terms of the Mortgage ("Reinstatement").  *See* Disclosure Statement, § V.  The Plan also states that the Debtor may choose, at its discretion, which track to follow and that, regardless of the track chosen, the Secured Creditor's claim is Unimpaired.  *See* Disclosure Statement, §§ IV–V.

24.     Unsurprisingly, the Debtor has identified neither available refinancing opportunities nor potential bidders for the Mortgaged Property.  *See* Disclosure Statement, § V.B.– C.  Instead, the Disclosure Statement stays sparse on details, reflecting what the Secured Creditor fears is an intention to avoid those tracks altogether.  Similarly, in an apparent attempt to make reinstatement appear a viable option, the Disclosure Statement fails to provide any (much less adequate) information regarding the Debtor's numerous defaults under the mortgage or the subsequent merger of the mortgage with the final Foreclosure Judgment.  *See* Disclosure Statement, § II.C.

25.     The Disclosure Statement fails to contain the adequate information required by section 1125.  It reflects a patently unconfirmable plan under section 1129.  As a result, approval of the Disclosure Statement should be denied.

## **OBJECTION**

### A.     **Approval Should Be Denied Based on Patently Unconfirmable Plan.**

26.     Courts across this and other districts have recognized that approval of a disclosure statement may be denied if the statement describes a patently unconfirmable plan.  Although confirmation issues are ordinarily not addressed at the disclosure statement stage, "if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation

-8-

of acceptances and rejections and a contested confirmation hearing." *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 153–54 (3d Cir. 2012) (collecting cases); *In re Quigley Co.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied."); *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed.").

27.    As pointed out by the Bankruptcy Court for the Northern District of New York, "[s]ubmitting the debtor to the attendant expense of soliciting votes and seeking court approval on a clearly fruitless venture would be costly and it would delay any possibility of a successful reorganization." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) (quoting *In re Pecht*, 53 B.R. 768, 768–69 (Bankr. E.D. Va. 1985); *see also In re R&G Props., Inc.*, No. 08-10876, 2009 WL 2043873, at *3 (Bankr. D. Vt. July 6, 2009) (stating that a court **<u>must</u>** deny approval of a disclosure statement where the plan described therein cannot be confirmed); *In re Atl. Terrace Apt. Corp.*, 226 B.R. 535, 536 (Bankr. E.D.N.Y. 1998) (denying approval of disclosure statement due to lack of adequate information and unconfirmability of plan).

28.    Courts reason that, under section 105 of the Bankruptcy Code, they have the discretion to control their own docket and the duty to prevent ongoing diminution of the bankruptcy estate in the form of expensive and time-consuming hearings on a plan that cannot be confirmed. *See In re Am. Capital Equip., LLC*, 688 F.3d at 154; *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990) ("Soliciting votes and seeking court approval on a clearly fruitless venture is a waste of the time of the Court and the parties."); *In re Pecht*, 53 B.R. at 139; *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr. S.D. 1984). Accordingly, a disclosure statement describing an unconfirmable plan should not be approved. *See In re GSC, Inc.*, 453 B.R.

132, 157 n.27 (Bankr. S.D.N.Y. 2011) ("An unconfirmable plan is grounds for rejection of the disclosure statement . . . ."). Given that the Secured Creditor has made advances to cover Mortgaged Property and the Debtor appears unlikely to do so, prolonging this chapter 11 case at the expense of the Secured Creditor so that the Debtor can attempt to pursue an unconfirmable plan is unfair and warrants denial of the Disclosure Statement.

> i.       *Improper Disenfranchisement of Secured Creditor*

29.      So long as Reinstatement of the Mortgage remains an option available at the Debtor's discretion under the Plan and proposes to treat the Secured Creditor as Unimpaired, the Plan cannot be confirmed, since it improperly disenfranchises the Secured Creditor.

30.      Upon entry of the Foreclosure Judgment, the Debtor's mortgage merged into the Final Judgment for $33,073,255.48, together with interest thereon.    Accordingly, there is obligation under the Mortgage for the Plan to "reinstate," and no legal manner whereby the Debtor can bring back its original payment terms.  In addition, altering the rights that the Secured Creditor has under the Foreclosure Judgment necessarily is inconsistent with proposed treatment that "does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest," as required under 11 U.S.C. § 1124(e) for a claim to be unimpaired.

31.      As set forth in the Secured Creditor's Supplemental Reply Brief in Support of Motion to Terminate Debtor's Exclusive Period Under Section 11 U.S.C. § 1121 (the "Supplemental Reply") [Docket No. 45], it is settled law in New York that a mortgage merges into a foreclosure judgment.  *See Taylor v. Wing*, 84 N.Y. 471, 477 (1881) ("After the entry of judgment of foreclosure the plaintiff was entitled to interest upon the sum found to be due upon

the mortgages, not by virtue of the mortgages, but by virtue of the judgment in which the mortgages became merged.").

32.     Subsequent cases in New York recognize the viability of the merger principle. *See generally Campbell v. Smith*, 309 A.D.2d 581, 582 (1st Dept. 2003) (explaining that one purpose of a notice of pendency is that it "alerts the public that the mortgage will be merged into the judgment of foreclosure."); *Howard v. Robbins*, 67 A.D. 245, 258 (4th Dept. 1901) ("While the judgment was in full force and effect the defendant bank purchased it, together with the mortgage which was merged in it, from the plaintiff in the foreclosure action, paying the face value therefor, together with the interest and costs, and obtained from the plaintiff an assignment of such judgment and of the mortgage which it foreclosed.").

33.     Had the Secured Creditor not obtained the Foreclosure Judgment, the Debtor could have decelerated the Mortgage under section 1124(2) and Reinstatement would have been one capable of being treatment that is Unimpaired.  However, "the existence of the judgment of foreclosure into which the mortgage was merged, cannot simply be ignored." *In re Saint Peter's Sch.*, 16 B.R. 404, 409–10 (Bankr. S.D.N.Y. 1982).

34.     As Judge Schwartzberg explained in *Saint Peter's Sch.*, *supra*:

> Its legal, equitable and contractual rights to immediate realization upon a foreclosure sale have been altered without any correlative provision for the payment, on the effective date of a proposed plan, of cash equal to the allowed amount of the judgment lien, as required under Code s 1124(3)(A). The debtor cannot now propose to cure previous defaults under the mortgage and reinstate its maturity for continued payments in accordance with its terms because the debtor's rights under the mortgage were terminated pursuant to state law when the bank obtained a judgment of foreclosure prior to the filing of the Chapter 11 petition. See *In re Triangle Laboratories, Inc.*, 663 F.2d 463 (3 Cir. 1981). In such instance a debtor cannot cure or achieve a deceleration of a pre-petition mortgage that was reduced to judgment. See *In re Garner*, 13 B.R. 799, 801 (Bkrtcy.B.C.S.D.N.Y.1981); *In re Pearson*, 10 B.R. 189 (Bkrtcy.B.C.E.D.N.Y.1981); *In re La Paglia*, 8 B.R. 937

(Bkrtcy.B.C.E.D.N.Y.1981). Had the bank not obtained a judgment of foreclosure, deceleration would be permitted under Code s 1124(2). However, the existence of the judgment of foreclosure into which the mortgage was merged, cannot simply be ignored. The foreclosure judgment provides the bank with an additional right to immediate realization of its legal, equitable and contractual interests. A deceleration of the mortgage would "otherwise alter the legal, equitable, *410 or contractual rights to which such claim or interest (the judgment of foreclosure) entitled the holder of such claim or interest" as proscribed under Code s 1124(2)(D).

*Ibid.*

ii.     *Mortgage Merges Into Foreclosure Judgment Under New York Law*

35.     While the Secured Creditor is aware of a line of chapter 13 cases permitting deceleration of a foreclosed mortgage, it should be noted that such cases are based on a misunderstanding of New York law and a misreading of Second Circuit precedent.  The primary case that misapplies New York law is *In re Acevedo*, 26 B.R. 994, 997 (E.D.N.Y. 1982).  Contrary to the assertions made in *In re Acevedo* and its progeny, and as shown in the paragraphs above, there is no quirk of New York law that overrides the general rule that a mortgage is merged into a foreclosure judgment upon entry of such judgment.  The New York Court of Appeals spoke to this very issue in *Taylor v. Wing*, recognizing the doctrine of merger under New York law in a decision that it has never overturned; subsequent Appellate Division cases presume the continuing viability of the merger doctrine.

36.     Although *Acevedo* cites to three New York state court cases in support of its contention that the doctrine of merger does not apply, none of the New York cases cited address the point for which they are cited.  *See In re Acevedo*, 26 B.R. at 997 (citing *Prudence Co. v. 160 W. Seventy-Third St. Corp.*, 183 N.E. 365 (N.Y. 1932), *Dulberg v. Ebenhart*, 68 A.D.2d 323 (N.Y. App. Div. 1979), and *Monday Props., Inc. v. A-1 Plumbing & Heating Co.*, 25 Misc. 2d 625 (N.Y. Sup. Ct. 1960).  Rather, *Prudence* and *Dulberg* address the rights of a tenant relative to the rights of a foreclosing party during the foreclosure process, while *Monday Props., Inc.* actually states the

145525936.5

opposite.  *See Monday Props., Inc.*, 25 Misc. 2d at 627 ("A foreclosed mortgage ordinarily merges

in the judgment and in the referee's deed."); *see also Prudence Co.*, 183 N.E. at 366 (discussing

rights of tenant of foreclosed property); *Dulberg*, 68 A.D.2d at 327 (same).

37.     *Acevedo, supra*, also misapplies *In re Taddeo*, 685 F.2d 24, 26–29 (2d Cir. 1982).

*Taddeo*, which is the Second Circuit precedent relied upon by *Acevedo* and its progeny, spoke not

to the issue of merger under New York law, but rather to the right of a party to decelerate a

mortgage *before* a final foreclosure judgment had been obtained.  Thus, it cannot be read to negate

the New York courts' merger doctrine (indeed, the Second Circuit cannot do so in any event; see

note 4, *infra*).  *In re Kumari*, Case No. 18-40130-CEC, 2019 WL 1423083, at *2 (Bankr. E.D.N.Y.

Mar. 27, 2019) relies entirely on *Acevedo, supra*, does not cite *Saint Peter's Sch.*, *supra* and does

not cite *Taylor, supra.*  Accordingly, these cases do not apply to the situation before this Court,

where the Debtor seeks to ignore the doctrine of merger altogether.[4]

38.     The merger doctrine is fundamental, because a foreclosure judgment confers rights

upon a mortgagee that surpass those of a mortgage.  Those rights include the right to be free of

challenges to the amount due and owing, *see, e.g.*, *Grady v. Utica Mut. Ins. Co.*, 69 A.D.2d 668,

677 (2d Dept. 1979) (stating (i) that a party to foreclosure proceedings cannot later collaterally

attack amount of foreclosure judgement; and (ii) non-parties to foreclosure proceedings can only

collaterally attack amount of foreclosure judgment if error in computation is shown); *Dulberg v*

*Ebenhart*, 68 A.D.2d 323, 327 (1st Dept. 1979) ("It is well recognized that a judgment of

---

[4] To the extent that those cases have not followed applicable precedent from New York's highest court, those decisions are nearly impossible to reconcile with the United States Supreme Court's command in *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 205 (1956) (1910 decision must be followed in absence of confusion in state decisions since there were "no developing line of authorities that cast a shadow over established ones, no dicta, doubts or ambiguities . . . , no legislative development that promises to undermine the judicial rule").  As noted above, there is no doubt that New York courts continue to presuppose and apply the doctrine that a mortgage merges into a foreclosure judgment.

-13-

foreclosure and sale is final and an adjudication of all questions at issue."). The rights under the foreclosure judgment also include the right to force judicial sale of the property if the full amount determined in the foreclosure judgment to be due and owing is not repaid. Cf. *NYCTL 1999-1 Trust v. 573 Jackson Ave. Realty Corp.*, 13 N.Y.3d 573 (2009) (avoidance of foreclosure sale only happens when a party in interest acts to "redeem the property by unconditionally tendering the total amount owed."); *Belsid Holding Corp. v Dahm*, 12 A.D.2d 499 (2d Dept. 1960).

39.     With all due respect to certain bankruptcy courts that have recited a following of *Acevedo*, those courts have not followed the clear law in New York that is unchanged since 1881 at the latest. While bankruptcy courts are courts of equity, that equity is not boundless. In exercising their equitable powers, bankruptcy courts may not contravene specific statutory provisions. *Law v. Siegel*, 571 U.S. 415, 421 (2014).

    *iii.     Foreclosure Judgment Provides Rights Beyond Mortgage*

40.     Applying those principles to the facts at issue here, the following realities emerge. The Secured Creditor holds the Foreclosure Judgment, which was entered in a contested proceeding where the Debtor was represented by counsel (the same firm representing the Debtor in this case). The Foreclosure Judgment fixed the amount due in excess of $33,073,255.28, together with interest thereon from December 5, 2018 at the default per diem rate of $7,337.19 (plus protective advances made by the Secured Creditor). The Foreclosure Judgment amount may not be challenged by the Debtor. The Foreclosure Judgment entitles the Secured Creditor to payment of the amount of the Foreclosure Judgment if the Debtor wishes to redeem the Mortgaged Property, absent which the Secured Creditor is entitle to judicial sale of the Mortgaged Property.[5]

---

[5] The automatic stay prevents an immediate sale. But the stay under Section 362(a) does not void or modify a foreclosure judgment of sale.

Reinstatement would deprive the Secured Creditor of payment of the full amount of the Foreclosure Judgment and of the right to compel immediate judicial sale absent its payment.

41.     Those rights, if altered, constitute alteration of the legal rights of the Secured Creditor under state law.[6]  Therefore, Reinstatement, which would alter state law rights provided under the Foreclosure Judgment, does not leave the Secured Creditor Unimpaired.  Thus, the Plan is unconfirmable if the Secured Creditor's vote is not solicited.  Since the Disclosure Statement does not propose to solicit the Secured Creditor's vote, the Disclosure Statement is improper and should not be approved.

    *iv.*     *Paying Class 2 Before Paying the Foreclosure Judgment Is Impairment*

42.     Another point merits mention.  To cure all defaults, the Debtor will have to cure the default occasioned by the granting of the mortgage held by the Class 2 creditor that was a breach of the Mortgage.  See *In re Young Broad.*, 430 B.R. 99, 115 (Bankr. S.D.N.Y. 2010) (requiring cure of all non-monetary defaults for plan to be confirmed); *In re Charter Commc'ns*, 419 B.R. 221, 249 (Bankr. S.D.N.Y. 2009) (same).  See also *In re 2712 Mission Partners, L.P.*, 2010 WL 431738 * 3 -- 4 (Bankr. N.D.Cal. 2009) (court, after reasoning that "section 1124(2)(A) requires the cure of almost all non-monetary defaults" noted that the only way the debtor could cure the default would be to repay the second deed of trust, thus brining it in compliance with the loan documents).  Thus, curing the default requires paying the Class 2 creditor in full.  That is treatment that would leave the Class 2 creditor Unimpaired.  Yet, Class 2 is being treated under the Plan as impaired.  This is an internal inherent inconsistency in the Plan.

---

[6]  See *In re Moody Nat. SHS Hous. H, LLC*, 426 B.R. 667, 671–72 (Bankr. S.D. Tex. 2010) ("To leave the holder unimpaired, the holder must either retain all of its state law rights under subsection (1) or the plan must meet five requirements, as set forth in subsections (A) through (E) of subsection 2."); see also In re

43.     More significantly, it shows that the Plan is unfair and inequitable to the Secured Creditor if Reinstatement occurs.  Since Reinstatement must be held to be impairment of the Secured Creditor's claim, if the Secured Creditor rejects the Plan because of Reinstatement, the Plan could only be confirmed if it were found to be fair and equitable and not discriminate unfairly against the Secured Creditor.  11 U.S.C. § 1129(b).  Yet, if Reinstatement were to occur and the Class 2 creditor paid in full, this would invert priorities completely, which is the epitome of inherent unfairness.  The Secured Creditor's Mortgage has priority over that of the Class 2 Creditor.  Yet, under the Plan, the result would be that the Secured Creditor would not receive the full amount of the Foreclosure Judgment or the right of immediate sale while the Class 2 creditor, whose lien is inferior in priority to that of the Secured Creditor, would be paid in full despite that procurement of the mortgage from that creditor created a fundamental default under the Mortgage.

44.     The unfairness of that is self-evident.  In addition, such reversal of priorities clearly alters the Secured Creditor's rights under state law, so that is an additional factor preventing the treatment of its claim on Reinstatement as Unimpaired.

45.     The status of the Plan's treatment of the Secured Creditor as Unimpaired is improper for another reason. Because in fact Reinstatement is impairment, if the Secured Creditor does not accept the Plan, the Debtor's exclusivity will terminate within 180 days of the petition date, because the Debtor will not have procured acceptances of all impaired classes under the Plan. The Debtor cannot manipulate the exclusivity periods by calling the Secured Creditor's treatment under Reinstatement Unimpaired when in fact that is not the case.

        *v.      Proposed Release of Tse Unconfirmable*

46.     As noted above, Tse has executed and delivered to the Secured Creditor the Guaranty.  He has full recourse liability, among other things on account of granting a junior

-16-

mortgage on the Mortgaged Property without Secured Creditor's consent. The Plan's proposed

release of Tse is impermissible under 11 U.S.C. § 524(e) and thus the Plan cannot be confirmed.

### B.   Approval Should Be Denied Based on Lack of Adequate Information.

47.     In addition to the Plan issues, approval of the Disclosure Statement should be

denied on the basis that the Disclosure Statement fails to contain adequate information under

section 1125. Section 1125 of the Bankruptcy Code defines adequate information as "information

of a kind, and in sufficient detail . . . that would enable such a hypothetical investor of the relevant

class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). In determining

whether a disclosure statement provides adequate information, "the court shall consider the

complexity of the case, the benefit of additional information to creditors and other parties in

interest, and the cost of providing additional information." *Id.*

48.     Here, the Disclosure Statement lacks adequate information on multiple fronts — in

addition to defaults under the mortgage and one regarding the Secured Creditor's right to vote.

*i.     No Disclosure Regarding Numerous Defaults*

49.     First, the Disclosure Statement contains inadequate background regarding the

Debtor's default and the resulting entry of the Foreclosure Judgment. Contrary to the single

sentence on the subject in section II.C., which states foreclosure occurred as a result of "alleged

defaults," the Foreclosure Judgment finally and fully determined that the Debtor defaulted on its

mortgage as a result of several events of default, including payment defaults, failure to set up cash

management, information delivery failures, leasing activities contrary to the mortgage covenants,

and the granting of a second mortgage to a junior lienholder without the prior consent of the

Secured Creditor. These issues have been fully and finally adjudicated by the State Court and are

not now open to question. *See, e.g.*, *In re 231 Fourth Ave. Lyceum*, *LLC*, 513 B.R. 25, 33 (Bankr.

145525936.5

E.D.N.Y. 2014) (citing *Charell v. Gonzalez (In re Gonzalez)*, 241 B.R. 67, 72 (S.D.N.Y. 1999)

and *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) for applicability of *res*

*judicata* principles to foreclosure judgments attacked in bankruptcy); *In re Sanders*, 408 B.R. 25,

33 (Bankr. E.D.N.Y. 2009) (citing *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 84 (2d

Cir. 2005) for point that the Rooker-Feldman doctrine strips federal courts of subject matter

jurisdiction over lawsuits that are, in substance, appeals from underlying state court decisions).

50.     Of note, several of these non-monetary defaults are incurable by the Debtor, making

deceleration and reinstatement an impossible track even if merger had not already occurred.  *See,*

*e.g.*, *In re Young Broad.*, 430 B.R. 99, 115 (Bankr. S.D.N.Y. 2010) (requiring cure of all

non-monetary defaults for plan to be confirmed); *In re Charter Commc'ns*, 419 B.R. 221, 249

(Bankr. S.D.N.Y. 2009) (same).

51.     These include:

- Failure to obtain a CO (see Gilfoil Decl., ¶10 [Docket No. 5-2];

- Failure to make repairs (*ibid* and ¶18);

- Permitting approvals to lapse (ones that the Receiver has been informed are unlikely to be revived if Tse remains in control) (id. at ¶¶ 13 - 16);

- Building code violations (id. at ¶15);

- Gutting of the rent roll and conduct of one-time events without Secured Creditor approval (see See Bornheimer Decl. ¶52) [Docket No. 54];

- The need to repay all protective advances (unmentioned in the Disclosure Statement).

52.     The Disclosure Statement omits any discussion of these defaults, the costs to cure,

any obstacles to procurement of cure and any consequences of non-procurement of cure.  As a

145525936.5

result, the Disclosure Statement provides no information to enable any creditor to determine whether cure is capable of occurring and thus whether Reinstatement is likely (and thus whether or not to accept the Plan premised on the prospect of Reinstatement).

53.     Accordingly, the Disclosure Statement fails to inform creditors adequately that Reinstatement of the Mortgage cannot take place under the Plan (and that Refinance is unlikely to occur unless those numerous defaults can be cured).

*ii.*     *No Liquidation Analysis*

54.     Perhaps most glaringly, the Disclosure Statement omits a liquidation analysis.  That is a fundamental flaw.  The purpose of a liquidating analysis is to enable creditors to make an informed decision as to whether to accept or reject a plan.  And, a fundamental benchmark of any liquidation analysis is a proffer by the Debtor of what would be achieved in a sale under chapter 7, to provide a benchmark for comparison with alternatives.

55.     The Disclosure Statement blithely seeks to side-step that flaw by positing that a sale in a chapter 11 case is more efficient and will yield more proceeds than if the sale were to occur in chapter 7.  If the Plan were a pure sale plan, that blitheness would be immaterial.  But, since there are two other tracks under the Plan (Refinance and Reinstatement), were the Debtor to pursue one of them, the difference between chapter 11 sales and chapter 7 sales would do nothing to inform any creditor of its likely distribution under the Plan.  How can a creditor sensibly decide to accept the Plan, when it is impossible (given the lack of liquidation analysis) to show each creditor that its distribution in a Refinance or Reinstatement will exceed its distribution in a chapter 7 case involving liquidation of the Mortgaged Property?  What if a Refinance or Reinstatement were to leave no money for distribution to unsecured creditors, but a sale would yield a distribution?  How can a creditor make such a determination without a meaningful liquidation analysis?

-19-

> ### iii.   How Does the Debtor Operate post-Reinstatement If Wound Down?

56.     Other disclosures are glaringly absent from the Disclosure Statement.   These include failure to describe how the Debtor will continue to exist and operate if Reinstatement were to occur (see paragraphs 10 through 14 above).   Wind-down of the Debtor is inconsistent with Reinstatement.   Moreover, wind-down represents an ongoing breach of the Mortgage!

57.     As noted above, the Disclosure Statement fails to explain if, as the Plan provides, the only distribution to Class 4 interests is the Distribution Fund, then, if a Refinance occurs, who owns the equity in the Debtor.   Since the distributions to unsecured creditors cannot be ascertained or anticipated based on the lack of a liquidation analysis, is this an attempt to conceal from creditors the fact that the Debtor intends for its principal to retain the equity even if all creditors are not paid in full (in breach of Section 1129(b)(2)(B) of the Bankruptcy Code if the unsecured creditors do not accept the Plan)?

> ### iv.   Which Track Will the Debtor Choose, and How?

58.     Indeed, perhaps another fundamental lack of disclosure is the set of factors by which the Debtor will decide whether to pursue Sale, Refinance or Reinstatement.   Since the Disclosure Statement provides no information to enable any creditor to have any meaningful way to anticipate its distribution in a Refinance or Reinstatement, as opposed to a Sale, or to know if any distribution would be available to creditors in a Refinance or Reinstatement (so as to enable the creditors to determine if the distribution in a Refinance or Reinstatement is better or not than anticipated distribution in a chapter 7 liquidation), the Disclosure Statement plainly fails to provide adequate information.

145525936.5

*v.      Other Disclosure Shortcomings*

59.     The Disclosure Statement also omits consideration of alternative plans.   The Secured Creditor has sought leave to file its own plan.   That plan would likely provide a convenience class for small creditors and a fixed sum to be paid to the pool of larger creditors.  That could produce a better outcome for creditors than the Plan's nebulous provisions.   The Disclosure Statement fails to provide information about such a possibility (the Disclosure Statement does not reflect any analysis by the Debtor of a Secured Creditor plan or why the Debtor concluded that the Plan somehow inherently is a better result for creditors than a plan from the Secured Creditor).

60.     The Disclosure Statement also fails to disclose how the possibility of Reinstatement or Refinance may affect bidding for a Sale and thereby affect potential distributions.

61.     And, as noted above, if the Debtor is to be wound down under Section 4.3 of the Plan, the Disclosure Statement fails to provide any information to show that Reinstatement (or Refinance, for that matter) makes any sense.   And, if that is the case, the Disclosure Statement provides no information to show that Tse should receive a release of his guaranty (particularly since the Disclosure Statement does not recite any anticipated contribution from Tse to the Distribution Fund).   As noted above, the inherent internal inconsistencies in the Plan are such that no disclosure statement could contain adequate information to explain these unexplainable items.  Thus, the Disclosure Statement should not be approved.

-21-

**WHEREFORE**, the Secured Creditor respectfully requests that the Court enter an order denying approval of the Disclosure Statement and any other relief as may be equitable and just for the reasons set forth above.

DATED:  September 5, 2019            PERKINS COIE LLP

                    By:    _/s/ Gary F. Eisenberg_____
                    Gary F. Eisenberg, Esq.
                    1155 Avenue of the Americas, 22nd Floor
                    New York, NY 10036
                    Telephone: (212) 262-6900
                    Fax: (212) 977-1649
                    Email: geisenberg@perkinscoie.com

                    *Attorneys for Wilmington Trust, N.A., as*
                    *Trustee for the Benefit of the Holders of*
                    *LCCM 2017-LC26 Mortgage Trust*
                    *Commercial Mortgage Pass-Through*
                    *Certificates, Series 2017-LC26*

-22-